**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION**

| | |
|---|---|
| TANYA KAY JACK, | ) |
| | ) |
| Plaintiff, | ) CASE NO.: 3:15-cv-00108-JAJ-CFB |
| | ) |
| v. | ) |
| | ) |
| CAROLYN W. COLVIN, | ) **REPORT AND RECOMMENDATION** |
| Commissioner of Social Security, | ) **AND ORDER** |
| | ) |
| Defendant. | ) |

Plaintiff Tanya Kay Jack moves for reversal of the Defendant Social Security Commissioner's decision denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*., or remand of this case for further hearing as to some of her medical conditions. The Commissioner moves for the denial of benefits to be affirmed. This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

**I. PROCEDURAL BACKGROUND**

Jack filed a Title II application for DIB on May 17, 2012, alleging a disability onset date of January 5, 2009 [AR[1] 143–151]. The Commissioner initially denied her claim on November 20, 2012 [AR 90–93], and again upon reconsideration on March 7, 2013 [AR 97–100]. Jack timely requested and received a hearing before Administrative Law Judge (ALJ), John E. Sandbothe, on May 1, 2014 [AR 34–57]. On August 1, 2014, the ALJ opined that Jack was not disabled at any time between January 5, 2009 (date of onset) and March 31, 2013 (date last

---

[1] All citations to "AR" refer to the appropriate page of the administrative record.

insured), and denied Jack benefits [AR 27]. The Commissioner's decision became final when the Appeals Council denied Jack's request for review [AR 15–16] of the ALJ's decision on August 19, 2015 [AR 1–4]. Jack now appeals the denial of benefits [ECF 1]. On January 7, 2016, this case was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) [ECF 9]. This matter is fully briefed and ripe for decision [ECF 14–16].

## II. FACTUAL BACKGROUND

Born August 1966, Jack was 47 years old at the time of the ALJ hearing in 2014 [AR 35–36]. Jack is married and high-school educated [AR 36]. Prior to her claimed onset of disability in 2009, Jack worked as a bartender, cashier, home attendant, hotel clerk, picker, industrial cleaner and machine packager from 1998 to 2008; during this time, Jack had peak earnings of $38,642.92 [AR 37, 152–156, 173, 260]. Jack attempted to work as a bartender and daycare worker while her application for disability benefits was pending [AR 36–37].

During her ALJ hearing, Jack testified that she did not cook, clean or care for herself [AR 42]. She testified that she did not do the laundry, mow the lawn, shovel snow, or attend social activities, but she read and watched television with limited success [AR 43]. However, on her Function Report to Social Security dated May 30, 2012, she wrote that she dressed herself, showered (but had trouble bending over to wash her feet), did a little housework, cooked lunch and supper, loaded the dishwasher, made the bed, watched her granddaughter, and took the dog out [AR 209–214].

### III. MEDICAL HISTORY

In her disability application, Jack alleges disability due to fibromyalgia, degenerative disc disease, asthma and migraines [AR 180]; in her brief to this Court, for the first time she raised the claim that obesity was a cause of her disability [ECF 14].

#### A.  Fibromyalgia, Degenerative Disc Disease and Migraines

On August 20, 2009, Jack was referred by her examining physician Amy Lindaman, M.D. to a neurologist, Anil Dhuna, M.D., for consultation regarding migraines and fibromyalgia[2] [AR 267]. Dr. Dhuna's treatment notes indicated that he had seen Jack in 2007, and at that time diagnosed her with fibromyalgia and chronic pain related to migraines [AR 267]. During the ALJ hearing, Jack testified that she started having migraines after she began working at the Dial Corporation in 1998 [AR 46, 155]. Jack testified that she has migraines one-to-two times a month and that the migraines last anywhere from twenty-four hours to three days [AR 204]. From 2009 to 2014, Jack saw neurologists Dr. Dhuna and Jugal Raval, M.D., for examination and treatment of her fibromyalgia and migraines [AR 267, 268, 270, 499–508].

The August 20, 2009, treatment notes indicate that Dr. Dhuna prescribed Jack Neurontin 300mg three times a day at a 2007 appointment, and that the Neurontin was working "fairly well," but she was still experiencing pain from headaches and flare-ups of her fibromyalgia [AR 267]. After the August 2009 exam, Dr. Dhuna prescribed Lyrica 75mg twice a day for her headache pain, and recommended cessation of Advil, with an increased dosage of Neurontin, if

---

[2] Fibromyalgia is a chronic pain disorder characterized by tender muscles, spasms, fatigue, stiffness, depression, and trouble sleeping. Social Security Rulings (SSR) 12-2p (2012). Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1) (2007). Published Social Security Rulings, while not binding on this Court, are binding on all components of the Social Security Administration. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Grebenick v. Chater*, 121 F.3d 1193, 1200 (8th Cir. 1997).

Lyrica did not help relieve Jack's pain [AR 268]. Dr. Dhuna also prescribed Imitrex 25mg, as needed for break-through pain from headaches. At her October 12, 2009, follow-up appointment, Dr. Dhuna noted that Jack was not responding well to Lyrica, and continued the Neurontin 300mg, with Oxycontin or Vicodin for break-through pain [AR 270, 266]. On a September 13, 2010, appointment, Dr. Dhuna noted that Imitrex was not effective for Jack's migraines, and that Jack was taking Vicodin 500mg two-to-three times a week for break-through pain, but that Jack's "pain from fibromyalgia is tolerable" [AR 270]. However, at the ALJ hearing on May 1, 2014, Jack testified that she took Vicodin twice a day [AR 44].[3]

On December 27, 2012, Jack saw a neurologist, Dr. Raval, for an examination and follow-up appointment [AR 499]. Dr. Raval prescribed Nortriptyline 10mg and Cyclobenzaprine 10mg to help with her pain [AR 501]. At her August 6, 2013, follow-up appointment with Dr. Raval, she complained that Vicodin was no longer effective for reducing her pain [AR 503–505]. Dr. Ravel prescribed Fioricet, to be taken every eight hours for severe headaches. At her January 22, 2014, follow-up appointment, Dr. Ravel prescribed Ritalin 5mg for Jack's possible attention deficit disorder [AR 506–508].

Beginning April 29, 2009, Jack went to the Advance Chiropractic Center for further back and neck treatment [AR 275]. In the course of more than twenty visits between January 2009 and March 2013, Jack consistently reported pain in her legs and lower back. Her most frequent visits were in 2012 [AR 275–80, 300–302, 697–735]. She reported that her low back and leg pain was on-going, and that it began six years earlier, after she fell down a flight of stairs [AR 275]. During these treatments, Jack ranked her discomfort in her lower back anywhere between

---

[3] It is unclear where Jack obtained the amount of Vicodin needed in order to take the medication twice daily.

5/10 and 9/10 [AR 275-303, 697–749]. However, from 2009 to 2012, at her weekly check-ups for her pulmonary symptoms with her primary care physician, Larae Stemmerman, D.O., Jack consistently reported no joint pain, limitation of motion, or fatigue [AR 309–369], and denied having headaches and difficulty walking [AR 355, 358, 361, 365]. Jack also denied leg pain on September 29, 2012, during an examination by Mark Regala, M.D. [AR 380]. Jack filled out a Personal Pain/Fatigue Questionnaire for Social Security on May 30, 2012, claiming pain throughout her body, including her legs, back, and neck [AR 199–207]. During her follow-up appointment with Dr. Raval on August 6, 2013, Jack indicated that "she can sleep 12 hours a day" [AR 623].

In 2009, Jack saw a plastic surgeon who recommended that Jack undergo breast-reduction surgery; Dr. Dhuna also recommended this surgery to decrease her pain [AR 270]. At a September 13, 2010, follow-up visit with Dr. Dhuna, Jack reported that as a result of the breast reduction surgery, her chronic fibromyalgia pain improved, and her costochroniditis/chest pain was "greatly improved" [AR 271].

Jack was admitted to the hospital on November 30, 2011, with low back pain [AR 272]. Katherine L. Reuter, A.R.N.P., ordered an MRI. The MRI results indicated no acute abnormalities of her lumbar spine, and minimal degenerative disc disease. Jack was again admitted to the hospital on September 29, 2012, for asthma symptoms [AR 377]. While there, Jack was seen by Mark Regala, M.D., for an examination [AR 380]. Dr. Regala prescribed Motrin PM for Jack's headaches [AR 381].

During an October 14, 2012, follow-up appointment with Dr. Dhuna, Luanne Johnson, C-N.P., conducted a trigger-point evaluation on Jack to test for fibromyalgia, and to supplement Dr. Dhuna and Johnson's letter to Social Security [AR 422]. The evaluation indicated that Jack was

5

positive for 18/18 trigger-points.[4] Jack also had six positive control points. On October 15, 2012, relying upon these results, Johnson wrote a letter to Social Security, and noted that Jack reported that she could only take stairs one at a time because of her lower back pain, and that she had trouble holding previous jobs because of difficulty bending, and standing or sitting, for greater than fifteen minutes at a time [AR 417–419]. Johnson observed that Jack demonstrated difficulty bending, squatting, and maneuvering [AR 419].

### B. Asthma and Pulmonary Issues

During her 2014 ALJ hearing, Jack testified that her asthma made it difficult to breathe while exerting herself [AR 200]. Jack saw her primary care physician Larae Stemmerman, D.O., weekly from 2009 to 2014 to get shots for her allergies [AR 39]. Jack testified that these weekly shots "don't really affect me too much," and the medicine might "throw me into an asthma attack" [AR 39]. Dr. Stemmerman's treatment notes from 2009 to 2014, consistently indicate that Jack reported that the shots improved her symptoms [AR 548–651]. Jack also testified that she took inhalation sprays, Flovent, Advair, and Albuterol, for her asthma daily [AR 40]. During a October 11, 2012, appointment with Jeffrey Wilson, M.D., for examination of her pulmonary symptoms, Dr. Wilson noted that Jack was overusing her rescue inhalers. Dr. Wilson opined that overusing her inhalers could diminish the effectiveness of her other medications [AR 480]. Dr. Wilson recommended that Jack undergo a repeat sleep study because her clinical results suggested obstructive sleep apnea [AR 480], and diagnosed Jack with obstructive lung disease [AR 481]. On November 26, 2012, Jack underwent a sleep study [AR 461] per Dr. Wilson's

---

[4] A trigger-point exam tests eighteen location points on each side of the body for tenderness. SSR 12-2p (2012). The physician applies approximately nine pounds of force to each pressure area; each area tests positive if the person experiences pain during pressure. A control area is a location on the body that is not identified as a tender area in patients with fibromyalgia.

suggestion and Dr. Stemmerman's referral [AR 454]. After reviewing the results, Dr. Dhuna found that there was no explanation for her difficulty with sleeping [AR 454-463] and Dr. Wilson found that there was no evidence that Jack had obstructive sleep apnea [AR 486].

Jack's asthma and pulmonary symptoms are related to her daily cigarette smoking [AR 480, 377, 300]. Jack claimed to have stopped smoking six months prior to her October 11, 2012, appointment with Dr. Wilson [AR 479]. She claimed to have switched to using an electronic cigarette five-to-six times a day. During a follow-up visit with Dr. Wilson on February 14, 2013, Dr. Wilson noted that Jack had discontinued using electronic cigarettes [AR 487]. Jack was admitted to the hospital on September 29, 2012, after going to the Emergency Room several times complaining of wheezing and shortness of breath. When she was admitted, Irwin M. Clavel, M.D., examined her and noted that she was wheezing, but found that she was at baseline functioning. Dr. Clavel noted that Jack smoked five cigarettes a day, and he counseled her to discontinue smoking. Jack was discharged on October 2, 2012, after it was determined that she could function well and do her daily chores [AR 379, 388]. Jack's discharge diagnoses were: acute asthma exacerbation, acute bronchitis, migraine headaches, fibromyalgia, allergic rhinitis, and hypothyroidism [AR 389].

On December 3, 2009, Brandon Beauchamp, D.O., requested Jack get an x-ray to rule out cardiopulmonary disease [AR 364]. Jack's results came back normal and her lungs clear. On September 27, 2012, two days before Jack was hospitalized, Devin Takakuwa, M.D., requested an x-ray exam of Jack's chest by John Paiva, M.D. The results showed that Jack's chest was stable and she had no acute cardiopulmonary disease [AR 402]. During her hospitalization, on October 1, 2012, Dr. Regala ordered a chest x-ray for Jack; the results showed no acute cardiopulmonary findings [AR 393].

### C. Obesity

Jack's primary care physician, Dr. Stemmerman, treated Jack for obesity and asthma; between 2009 to 2014, her BMI fluctuated between 31 and 35.7 [AR 358, 326, 310, 371, 367, 478, 488, 506]. In an October 9, 2009, report, Dr. Stemmerman noted that Jack said she had "gained approximately 60 lbs. over the past 5 months" [AR 371]. Dr. Stemmerman's reports on November 23 and December 23, 2009 [AR 365, 358], noted that Jack's weight was improving with diet and exercise. In 2009 and 2013, Dr. Dhuna and Dr. Wilson also recommended that Jack exercise more and lose weight, because it would benefit her fatigue, pain and asthma control [AR 270, 488].

### IV. ALJ DECISION

On August 1, 2014, the ALJ issued a decision denying Jack's claim for DIB under Title II of the SSA [AR 27]. The ALJ analyzed Jack's claim utilizing a five-step sequential evaluation procedure [AR 20–30].[5]

---

[5] 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012) provides that "(i) [a]t the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . . (ii) At the second step, we consider the medical severity of your impairment(s). If you do not having a severe medically determinable physical or mental impairment that meets the duration requirement of § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . . (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [subpart P of part 404 of this chapter] and meets the duration requirement, we will find that you are disabled. . . . (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . . (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled."

At Step One, the ALJ determined that Jack had not engaged in substantial gainful activity[6] from the date of her alleged disability onset, January 5, 2009, through her date last insured, March 31, 2013 [AR 22].

At Step Two, the ALJ determined that Jack suffered from the following severe impairments[7]: fibromyalgia, degenerative disc disease, asthma, and migraines [AR 22].

At Step Three, the ALJ reviewed the medical record and determined that Jack's severe impairments, or combination of impairments, did not meet or medically equal one of the listed impairments in 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2016) [AR 22].

The ALJ determined that Jack had a residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b): lift up to 20 pounds occasionally and 10 pounds frequently; occasionally climb, balance, stoop, kneel, crouch and crawl; and avoid extreme temperatures, dust and fumes [AR 23]. The ALJ considered both objective evidence and Jack's subjective complaints regarding her exertional and nonexertional limitations. The ALJ considered Jack's complaints of fibromyalgia, severe asthma, back problems and migraines. The ALJ considered Jack's testimony that her pain was worsened by sitting, standing, or walking; she laid in bed all day; slept around 15 hours a day; she did not clean or cook; she had three migraines per month that lasted two-to-three days at a time; and her ongoing treatment for asthma, to find that Jack's listed impairments could reasonably be expected to cause the alleged symptoms. However, the ALJ found Jack's allegations about the intensity, persistence, and limiting effects of her pain "not entirely credible" [AR 24] because in Jack's 2012 Function

---

[6] 20 C.F.R. § 404.1572 defines "substantial gainful activity" as work involving significant physical or mental abilities usually for pay or profit.
[7] 20 C.F.R. § 404.1520(c) (2012) defines a "severe impairment" as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."

Report she stated that she cooked, cleaned, watched her granddaughter, and shopped independently; the November 30, 2011, MRI results showed minimal degenerative disc disease; treatment records from 2009 to 2014 consistently showed Jack denying joint pain and fatigue; 2009 and 2012 x-rays that were negative for pulmonary disease [AR 364, 393, 402]; Jack's history of smoking; and treatment notes from 2009 to 2014 indicating that Jack reported her asthma symptoms were well-controlled with medication [AR 24–25]. The ALJ gave significant weight to the opinions of the State-agency medical consultants, because their opinions were consistent with the medical evidence in the record [AR 25]. Dr. Stemmerman, Jack's treating physician, had no opinion as to whether Jack's impairments caused disability [AR 663], and Luanne Johnson, C-N.P., only opined in her letter to Social Security that Jack's memory issues that were secondary to her fibromyalgia "may impact her ability to handle cash benefits" [AR 419].

At Step Four, the ALJ determined that Jack was unable to perform any past relevant work, despite the vocational expert's testimony that Jack could perform some of her past work. The ALJ reasoned that the "past relevant work" that the vocational expert referred to was "not performed at the substantial gainful activity level" [AR 25].

At Step Five, the ALJ determined that, taking into consideration Jack's age, high school education, ability to communicate in English, and her RFC to perform light work, she could perform a significant number of jobs that exist in the national economy such as "Cashier II" and "Hotel clerk" [AR 26].

Based on these findings, the ALJ ruled that Jack was not disabled as defined by the SSA between January 5, 2009, through the date last insured, March 31, 2013 [AR 27], and denied her claim for benefits.

## V.  STANDARD OF REVIEW

The Court upholds an ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (reasoning that substantial evidence means "more than a mere scintilla"). The Court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If substantial evidence supports the ALJ's decision, the Court will not reverse merely because substantial evidence exists in the record that would support a contrary outcome, or because the Court would have determined the case differently. *Davidson v. Astrue*, 578 F.3d 838, 841–42 (8th Cir. 2009) (citing *England v. Astrue,* 490 F.3d 1017, 1019 (8th Cir. 2007)).

The Court also reviews the Commissioner's decision to determine if there was a procedural error, an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed *de novo*, with deference accorded to the Commission's construction of the Social Security Act. *See Petersen v. Astrue*, 633 F.3d 633, 636 (8th Cir. 2011) (citing *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992)).

## VI.  DISCUSSION

Jack moves to reverse or remand the ALJ's decision because: a) the ALJ failed to consider her obesity as a medically determinable impairment, its impact on other severe

impairments, and its impact on her overall RFC; b) the ALJ did not consider the effects of her migraines or the side effects of her medications when determining her RFC; and c) the ALJ improperly discredited her subjective complaints related to pain.

### A. The ALJ'S Failure to Discuss Jack's Obesity Is Not Reversible Error

Jack argues that the ALJ's findings were in error, because the ALJ failed to consider the impact of Jack's obesity on her RFC determination, or on whether Jack qualified as disabled under the Listings, pursuant to 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Jack raised the claim that obesity was a cause of her disability for the first time in her brief to this Court [ECF 14].

An ALJ is required to consider a claimant's obesity when determining whether the claimant has a severe impairment, if the impairments qualify under the Listings, and in determining the claimant's RFC. SSR 02-1p (2002). Obesity is defined as having a Body Mass Index (BMI) of 30 or greater. *Id.* A claimant is generally considered obese if either a physician's diagnosis establishes obesity, or the claimant's BMI consistently shows obesity. *Id.* Obesity is considered an impairment in and of itself; obesity can also cause other impairments, or exacerbate existing impairments. *Id.*

Dr. Stemmerman, Jack's primary-care physician, and Dr. Raval, Jack's treating neurologist, documented Jack's BMI from 2009 to 2014. It fluctuated between 31 and 35.7, which is within the definition of obesity [AR 358, 326, 310, 371, 367, 478, 488, 506]. The ALJ was required to consider that Jack was obese and failed to list it as a medically determinable impairment. While the ALJ did not list obesity as a separate, medically determinable impairment, or expressly discuss Jack's obesity, the ALJ specified that the record as a whole and all of Jack's symptoms were considered [AR 23]. This record included the State-agency disability determination in November 2012, which specified that Jack's severe impairments were

considered in combination with her obesity to find that she was not disabled [AR 64–67]. This record included reports of Jack's weight increase over the relevant time period, as recorded in the medical record and on her disability application.

Additionally, the burden is on the claimant to establish the severity of an impairment, or combination of impairments. *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir. 2000). "Severity is not an onerous requirement for the claimant to meet, *see Hudson v. Bowen,* 870 F.2d 1392, 1395 (8th Cir.1989), but it is also not a toothless standard." *Kirby v. Astrue,* 500 F.3d 705, 707–08 (8th Cir. 2007) (finding that slight abnormalities do not amount to severe impairments). "There is no specific level of weight or BMI that equates with a 'severe' or a 'not severe' impairment . . . [the Commissioner] will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 02-1p. Jack failed to meet her burden of proof on this issue, because she did not claim obesity as a severe impairment on her disability application, Function Report, Questionnaire, or at the hearing [AR 36, 180, 199–215]. Whether the ALJ should have separately listed obesity as a severe impairment is insignificant here, because the ALJ found Jack to have a severe impairment at Step Two, and proceeded to the next Steps of the required analysis for a disability claim, where the ALJ then considered the whole record. *See Dewey v. Astrue*, 509 F.3d 447, 449–50 (8th Cir. 2007); *see also Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005); *see also Hall v. Colvin*, No. C15-15-CJW, 2016 WL 1267759, at *5 (N.D. Iowa Mar. 30, 2016).

Jack argues that her obesity should have been considered when determining whether she qualified for one of the Listed disabilities in 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Under the relevant regulations, the Commissioner will find that obesity meets a Listing if it, in combination

with another impairment, meets the requirements of a Listing, such as a musculoskeletal impairment; however, the Commissioner is limited to the record, and cannot make assumptions about whether obesity, in combination with another impairment, would increase the severity of the impairment. *See* SSR 02-1p.

The record shows observations by some of Jack's treating physicians that obesity might have contributed to some of her impairments. Dr. Dhuna and Dr. Wilson recommended that exercise and weight-loss would benefit Jack's fatigue, pain and asthma control [AR 270, 488]. The ALJ considered the record as a whole, including Jack's complaints and objective evidence of back pain, asthma, and fatigue, and the medical records relating to Jack's obesity, when determining that she did not qualify as disabled under any Listing. There is substantial evidence on the record as a whole to support the ALJ's determination that Jack does not qualify for a Listing. The ALJ noted that the medical record showed Jack had normal functioning of extremities and body movement [AR 22–23]. The ALJ also noted that the medical records showed that Jack had no problems walking [AR 23].

The claimant has the burden to establish her RFC in the record. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *see also Gonzalez v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1520, 416.920)); *see also Hines v. Astrue*, 317 F. App'x 576, 578 (8th Cir. 2009). In a factually similar case, the Eighth Circuit held that the ALJ's failure to discuss obesity when determining RFC was not a fatal error because the claimant did not testify, and the record did not show, that obesity would impose any additional limitations than the symptoms or impairments considered. *Forte v. Barnhart*, 377 F.3d 896-97 (8th Cir. 2004). The Court relied upon the holding in *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995): "[i]n light of

the evidence of record, the fact that the [ALJ's] decision does not discuss obesity as an impairment is not fatal." *Forte*, 377 F.3d at 896–97.

Here, Jack does not argue that her obesity created any additional limitations other than those reflected in the record, only that it might exacerbate the impairments and conditions already discussed. Jack did not meet her burden to show that her obesity would affect her RFC. Jack did not testify that her weight affected her functioning or list it as an impairment in her disability application, Function Report, Questionnaire, or at the hearing [AR 36, 180, 199–215]. The failure of the ALJ to discuss obesity separately as a medically determinable impairment was not a reversible error because the ALJ considered the record as a whole when determining that Jack did not fall under one of the Listing impairments and when determining her RFC [AR 23]. Included in this record were the treating and examining physicians' notes documenting her weight gain during the relevant time period, and how her weight gain may adversely affect her pulmonary and pain symptoms. This record included the 2012 State-agency decision, which found that Jack was not disabled after evaluating her impairments in combination with her obesity.

## B. The ALJ Did Not Fail to Consider All Impairments When Determining RFC

Jack argues that the ALJ failed to account for her migraines, and the side effects of her medications, in the RFC determination. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ determined that Jack had an RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b). An ALJ may discount claims that medications are causing side effects never discussed with a physician, especially when claimant never requests different medications. *Richmond v. Shalala*, 23 F.3d 1441, 1443 (8th Cir. 1994). The only medication side effects that were ever discussed between Jack and her medical providers were the possibility that some of

the medications caused fatigue and migraines [AR 268]. The ALJ considered the record as a whole, including Jack's subjective complaints, and the objective medical record regarding her migraines and fatigue in making the RFC determination. The ALJ noted that Jack was seen for migraines by one treating physician and denied headaches to another treating physician within the same time period [AR 24].

It is Jack's burden to establish her RFC on the record. *Eichelberger*, 390 F.3d at 591; *see also Gonzalez*, 465 F.3d at 894 (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Hines*, 317 F. App'x at 578. The record included treatment notes from 2009 to 2014, indicating Jack reported to physicians that her symptoms were well-controlled with medication [AR 24-25]. The record included treatment notes that Jack denied headaches and fatigue [AR 309-369]. There is substantial evidence on the record that supports the ALJ's RFC determination, and that contradicts Jack's subjective allegations regarding the side-effects of her medications and severity of her migraines. The ALJ appropriately weighed the evidence presented.

## C.  ALJ Properly Discounted Jack's Subjective Complaints Regarding Pain

The ALJ did not err in discounting the intensity, persistence and limiting effects of Jack's alleged pain. The ALJ properly considered all of Jack's symptoms, to the extent the symptoms were consistent with the medical record and other evidence, pursuant to 20 C.F.R. § 404.1529 (2011), SSR 96-4p (1996), and SSR 16-3p (2016). *See Polaski*, 739 F.2d at 1322. The ALJ considered that:  Jack's 2011 MRI only showed minimal degeneration; her treating physician's treatment records consistently showed Jack had no neck or joint pain, problems walking, or problems with her range of motion; Jack was positive on six control points in her fibromyalgia tender-point test in 2012; chest x-rays in 2009 and 2012 were negative; pulmonary function tests in 2012 and 2013 only revealed a mild ventilator defect; Jack continued to smoke; and treatment

notes following her asthma shots indicate that the shots were improving Jack's symptoms. Additionally, the ALJ gave weight to the opinions of the State-agency medical consultants; their opinions were consistent with the medical evidence in the record. *See Musial v. Astrue*, 347 F. App'x 260, 262 (8th Cir. 2009) (holding the ALJ did not err by giving significant weight to the State-agency medical consultant because the claimant failed to provide medical evidence of the treating doctor imposing any specific functional restrictions that conflicted with the RFC analysis).

The ALJ appropriately gave less weight to Jack's hearing testimony that she could not do any chores and stayed in bed all day because it was at odds with her 2012 Function Report and her treating physicians' notes for the relevant time period. The ALJ found no other evidence in the record to explain the discrepancy between the doctors' observations and Jack's testimony regarding her daily activities. *See Thompson v. Astrue*, 226 F. App'x 617, 619–20 (8th Cir. 2007) (holding that the ALJ made a proper credibility determination because the claimant's testimony during the hearing was significantly different from the claimant's reports to physicians regarding the frequency and extent of the impairments); *see also Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). At the 2014 hearing, Jack's testimony that she stayed in bed all day and did no chores was significantly different from her 2012 Function Report, which stated that she cooked, cleaned, dusted, did laundry and shopped, and her 2012 medical treatment records, which indicated that Jack cleaned, completed chores around the house, and looked after her granddaughter. *See Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir. 2007) (deferring to the ALJ's credibility determination, as the claimant "made inconsistent reports of her activities of daily living"); s*ee also Forte*, 337 F.3d at 896 (citing *Tennant v. Apfel*, 224 F.3d 869, 870 (2000), to hold that part-time college attendance was inconsistent with allegations of disabling pain and

17

fatigue); *see also Riggins v. Apfel*, 177 F.3d 689, 692 (8th Cir. 1999); *see also Davis v. Apfel*, 29 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations."). The ALJ appropriately weighed the evidence presented.

## VII. CONCLUSION

The ALJ did not err in finding that Jack did not qualify for a disability determination. The ALJ's findings were supported by substantial evidence on the record, including the objective medical evidence, Jack's subjective complaints, Jack's testimony during the hearing, and the opinions of State-agency medical consultants. Failure to separately list obesity as a medically determinable impairment or discuss obesity, or its impact on another impairment, is not reversible error because Jack's resulting limitations were fully considered in the RFC determination and in the ALJ's determination that Jack did not meet or medically equal one of the Listed impairments in 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Jack's alleged intensity, persistence, and limiting effects of her claimed impairments were adequately considered, but discounted, because substantial evidence on the record was inconsistent with Jack's subjective allegations.

## VIII. REPORT AND RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision to deny Jack disability insurance benefits be affirmed.

IT IS ORDERED that the parties have until December 1, 2016, to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. 636(b)(1)(C). Any objections filed

must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *see also Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995). Failure to timely file objections may constitute a waiver of Plaintiff's right to appeal questions of fact. *United States v. Kelley*, 774 F.3d 434, 439 (8th Cir. 2014) (citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

    IT IS SO ORDERED.

    Dated this 10th day of November, 2016.

CELESTE F. BREMER
CHIEF UNITED STATES MAGISTRATE JUDGE